**MARC P. BERGER**
**REGIONAL DIRECTOR**
**Lara Shalov Mehraban**
**Sandeep Satwalekar**
**Christopher J. Dunnigan**
**Alison R. Levine**
**Attorneys for the Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0061 (Dunnigan)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,  :
                                                                      :
                                        Plaintiff,         :          **COMPLAINT**
                                                                      :
        -against-                                              :
                                                                      :          **19-CV-        (     )**
SAVRAJ GATA-AURA (a/k/a SAMUEL AURA      :
a/k/a SAM AURA) and CORE AGENTS, LTD. (d/b/a   :          **ECF CASE**
CORE AGENTS INTERNATIONAL, LTD.),           :
                                                                      :          **JURY TRIAL**
                                        Defendants,      :          **DEMANDED**
                                                                      :
-------------------------------------------------------------------x

      Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

defendants Savraj Gata-Aura (a/k/a Samuel Aura a/k/a Sam Aura) ("Aura") and Core Agents,

Ltd. (d/b/a Core Agents International, Ltd.) ("Core Agents") (collectively, "Defendants"), alleges

as follows:

## SUMMARY

      1.     From approximately September 2015 through June 2017 (the "Relevant

Period"), Defendants Aura and Core Agents, a company Aura owned and controlled, recruited a

network of sales agents to sell fraudulent investments to investors and served as the sales agents'
liaison to the entities offering the fraudulent investments.

2.      Defendants recruited and operated the network of sales agents to sell the
investments by using the offering entities' false and misleading offering materials.

3.      Defendants knew that these offerings were false and misleading.  Among other
things, the materials touted the background of a chief executive officer, who Aura knew did not
exist.  At the same time, the offering materials intentionally omitted any mention of Renwick
Haddow, the actual individual controlling the entities, because as Aura knew, Haddow had been
previously sued by the United Kingdom Financial Conduct Authority (the "FCA") for a prior
fraudulent investment scheme ostensibly involving the sales of interests in African farmland.

4.      On June 30, 2017, the Commission filed a complaint, naming Haddow and Bar
Works as defendants and alleging that they committed securities fraud, in a related enforcement
action, *SEC v. Renwick Haddow, et al.*, No. 17-cv-04950 (LGS) (S.D.N.Y.) (hereinafter "*SEC v.
Haddow*").

5.      During the Relevant Period, Defendants, directly or through sales agents that
Aura recruited, raised over $10 million from at least one hundred investors for the fraudulent
investments.

6.      These investments are now effectively worthless due to the fraudulent scheme,
including Haddow's misappropriation of investor funds for his own personal use.

7.      Defendants, in return for their role in selling the fraudulent investments,
received commissions that totaled at least $2.9 million from the entities offering the investments.

**VIOLATIONS**

8.      By virtue of the conduct alleged here, Defendants have aided and abetted
violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]

and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

9.      Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.     The Commission brings this action under Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].  The Commission seeks to permanently enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint and seeks an order requiring Defendants to disgorge all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest.  The Commission also seeks civil penalties against Defendants under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

11.     The Commission brings this action under the authority conferred by Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

12.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].  Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

13.     Venue lies in this district under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].  Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the

Southern District of New York.  Among other things, Aura resides in New York, New York, engaged in part of the unlawful conduct described herein from Bar Works' offices located in New York, New York, and sent emails to Haddow while Haddow lived and worked in New York, New York.

## DEFENDANTS

14.     **Aura**, age 33, is a U.K. citizen who currently lives in New York, New York. From approximately September 2015 to April 2017, Aura served as a representative of Bar Works and at times worked out of Bar Works' Manhattan offices.

15.     **Core Agents** is a U.K. corporation that Aura has controlled at all relevant times and for which Aura served as a representative.  Aura owns at least 75% of Core Agents.

## OTHER RELEVANT INDIVIDUAL AND ENTITIES

16.     **Haddow**, age 50, is a citizen of the United Kingdom ("U.K.") who is currently in a federal detention center in connection with the disposition of a federal criminal proceeding against him, *United States v. Renwick Haddow*, 17-mj-04939 (UA) (S.D.N.Y.) (hereinafter "*U.S. v. Haddow*").  From approximately 2014 through May 2017, Haddow resided in New York, New York.  On June 30, 2017, the Commission filed its complaint, alleging that Haddow committed securities fraud in *SEC v. Haddow*.  The same day, a criminal complaint against Haddow, which alleges facts arising out of the same conduct alleged in *SEC v. Haddow*, was unsealed in *U.S. v. Haddow*.  On April 13, 2018, Haddow was arrested upon his extradition from Morocco.

17.     **Bar Works, Inc.** ("Bar Works") is a Delaware corporation whose principal place of business was in New York, New York at all relevant times.  Haddow owns and at all relevant times controlled Bar Works, which offered short-term, shared office space in renovated bars in New York City and San Francisco.  The Commission's complaint in *SEC v. Haddow* named Bar Works as a defendant and alleged that it committed securities fraud.  On January 18,

2018, the Commission obtained a final default judgment against Bar Works.  The default judgment ordered Bar Works to pay disgorgement and prejudgment interest, jointly and severally with Bar Works 7th Avenue, Inc. of over $37 million and a civil penalty of over $4.5 million.

18.       **Bar Works 7th Avenue, Inc. ("7th Avenue" and, together with Bar Works, the "Bar Works Companies")** is a New York corporation whose principal place of business was in New York, New York at all relevant times.  Haddow formed and at all relevant times controlled 7th Avenue, which appears to have been created in connection with a Bar Works' location on 7th Avenue in Manhattan.  The Commission's complaint in *SEC v. Haddow* named 7th Avenue as a defendant and alleged that it committed securities fraud.  On January 18, 2018, the Commission obtained a final default judgment against 7th Avenue.  The default judgment ordered 7th Avenue to pay disgorgement and prejudgment interest, jointly and severally with Bar Works, of over $37 million and a civil penalty of over $4.5 million.

19.       **Bar Works Management, Inc. ("Bar Works Management")** is a New York corporation that Haddow founded and whose principal place of business was in New York, New York at all relevant times. During the Relevant Period, Bar Works held out Bar Works Management as Bar Works' wholly-owned subsidiary.

**FACTS**

I.       **Haddow and the Bar Works Companies Defrauded Investors.**

A.       **Haddow Gained Notoriety in the U.K. for Previous Misconduct.**

20.       In approximately November 2008, the U.K.'s Insolvency Service—a U.K. government agency whose work includes administering bankruptcies and disqualifying unfit directors in corporate failures—disqualified Haddow from serving as a director of a company for eight years.

21.      Haddow's misconduct as finance director of Branded Leisure plc, a company that would purportedly operate certain venues targeted at women ages 18 to 35, served as the basis of the disqualification.

22.      On December 10, 2008, the U.K.'s Insolvency Service issued a news release announcing the disqualification and noted: "The Schedule of Unfit Conduct which formed a part of the Disqualification Undertaking given by Mr. Haddow included…that he caused and/or allowed [Branded Leisure] to make inaccurate and misleading announcements…as to the progress of the company's building work, sales performance of the company, and the financial performance of the company…[and] [t]hat he caused and/or allowed the company to make false representations in a Board minute…in particular as to the financial position and prospects of the company, which caused investors to lose £500,000 in [a certain fund]."

23.      Shortly afterwards, the British press published articles about Haddow's disqualification.

24.      In July 2013, the FCA, the Commission's approximate counterpart in the U.K., filed a court action against Haddow and others based on misconduct—unrelated to Branded Leisure or the conduct alleged in *SEC v. Haddow*—involving ostensible investments in African farmland.

25.      The FCA alleged that Haddow and others unlawfully promoted or operated "collective investment schemes" involving African farmland in Sierra Leone when Haddow (and others) were not authorized under U.K. law to do so, and that the investment schemes were sold through the use of misleading statements.

26.     In February 2014, after holding a trial on the preliminary issue of whether the schemes were "collective investment schemes," the United Kingdom High Court of Justice, Chancery Division, ruled that they were.

27.     On approximately February 17, 2014, the FCA's public website announced the High Court's ruling on the preliminary issue: "The High Court agreed with the FCA that the schemes were unauthorised collective investment schemes and could not be lawfully operated by the defendants."

28.     Shortly thereafter, articles mentioning Haddow's role in the proceeding and in the alleged schemes appeared in the British press, including on the Internet.

29.     In March 2015, the British Court of Appeal rejected Haddow's appeal of that preliminary judgment, and the FCA later announced that news on its website.

**B.     Haddow Controlled the Bar Works Companies.**

**1.     Haddow Founded, Owned, and Controlled Bar Works.**

30.     On approximately July 24, 2015, Bar Works was incorporated in Delaware.

31.     On July 29, 2015, Haddow purchased all of Bar Works' shares.

32.     On August 5, 2015, Haddow opened two bank accounts in Bar Works' name.

33.     The account opening forms for both accounts listed Haddow as the owner of Bar Works and as the sole authorized signatory on the accounts.

34.     On December 21, 2015, Haddow instructed a Brooklyn-based tax firm (the "Tax Firm") to register Bar Works Management as a corporation.

35.     On approximately December 24, 2015, Haddow opened two additional accounts in Bar Works' name.

36.     Haddow signed the account opening forms for both accounts as Bar Works' president and again listed himself on the account opening forms as the sole authorized signatory for both accounts.

37.     On approximately December 29, 2015, Haddow opened another account in Bar Works' name.

38.     The account opening forms listed Haddow as Bar Works' "President/ Chairperson," represented that Haddow owned 100% of Bar Works, and made clear that Haddow was the only authorized signatory on the account.

39.     On approximately February 5, 2016, Bar Works submitted an annual Delaware franchise tax report, which, authorized by Haddow under penalty of perjury, listed Haddow as Bar Works' only officer and director and listed his title as Bar Works' president.

### 2.     Haddow Formed and Controlled 7th Avenue.

40.     On January 26, 2016, Haddow emailed the Tax Firm and asked it to set up a new company, 7th Avenue, "for a new property we are taking on."

41.     The same day, the Tax Firm filed 7th Avenue's certificate of incorporation, which Haddow signed as 7th Avenue's incorporator, with New York State.

42.     On approximately February 4, 2016, Haddow opened two bank accounts for 7th Avenue.

43.     Haddow signed opening forms for both accounts as 7th Avenue's president, and the forms listed Haddow as the only authorized signatory on the accounts.

### C.     The Bar Works Companies Offered Securities Primarily in the Form of Coupled Leases and Sub-Leases, Which Functioned as Investment Notes.

44.     In a press release dated September 8, 2015 (the "September 2015 Press Release"), Bar Works claimed to be "a new venture in the work space market, aiming to bring

real vibrancy to the flexible working scene by adding full-service work spaces to former bar and restaurant premises in central city locations."

45.     In the September 2015 Press Release, Bar Works announced that in October 2015 it expected to open its first location, at 47 West 39th Street in New York, New York (the "39th Street Location"), which would "offer up to 200 work units, plus meeting and networking areas."

46.     The September 2015 Press Release claimed that it would earn revenue by "charg[ing] a flat monthly fee to users of [its] work spaces" — customers such as "entrepreneurs, freelancers and travelling employees" who wanted a workspace outside their homes—through monthly membership fees that included not only regular access to a workspace but also services such as internet access, photocopying, coffee, "[h]eavily discounted" alcoholic drinks, and technical support.

47.     The September 2015 Press Release stated that Bar Works expected to raise $440,000 in financing by "offering 20 work space units" at the 39th Street Location that it would offer "to investors on 10-year leases."

48.     From approximately October 2015 through April 2017, Bar Works primarily raised funds from investors by offering "leases" coupled with "sub-leases" on individual workspaces in at least five different Bar Works locations—often before Bar Works had opened the locations for business—in at least New York City and San Francisco.

49.     Bar Works generally offered investors a ten-year lease (the "Lease")— typically entitled a "Wealth Builder Lease Agreement"—on a numbered workspace in a particular Bar Works location named in the Lease.

50.     The Leases typically purported to include the signature (or a blank space for the signature) of Bar Works' fictitious Chief Executive Officer, "Jonathan Black," on behalf of the Bar Works' affiliate serving as the counterparty on the Lease.

51.     To purchase a Lease on an individual workspace, investors paid Bar Works or a Bar Works affiliate an up-front, one-time purchase price generally ranging from $22,000 to $30,000, depending on the location of the workspace.

52.     Along with each Lease, each investor also signed a sub-lease ("Sub-Lease")—typically entitled a "Wealth Builder Sub-Lease Agreement"—for the Bar Works workspaces set out on the investor's Lease.

53.     The Sub-Leases typically purported to include the signature (or a blank space for the signature) of "Jonathan Black" on behalf of the Bar Works' affiliate serving as the counterparty on the Sub-Lease.

54.     Under the terms of each Sub-Lease, Bar Works or its affiliate agreed to pay the investor a fixed monthly "rental" fee, typically 14% to 16% of the investor's original Lease purchase price annually, for the duration of the Lease's term, which was usually ten years.

55.     Under the terms of each Sub-Lease, Bar Works or its affiliate typically agreed to pay each investor at least the designated monthly interest fee for the Lease's duration, regardless of whether Bar Works or its affiliate could obtain a paying customer for the workspaces purportedly covered by the investor's Lease—that is, whether or not Bar Works received revenue from the relevant workspaces.

56.     Haddow and the Bar Works Companies received and pooled the investors' funds together in at least three United States bank accounts in the names of Bar Works and 7th Avenue.

    **D.**    **Haddow and the Bar Works Companies Defrauded Investors, Including By Touting a Fictitious CEO to Conceal Haddow's Control of the Companies.**

    **1.**    **Bar Works' False and Misleading Investor Materials.**

57.    The September 2015 Press Release announcing Bar Works' venture identified Bar Works' founder and chief executive as "Jonathan Black."

58.    The press release contained a quote from "Jonathan Black" and claimed that "Jonathan [Black] and his team have already secured US$500,000 of funding from a Silicon Valley backer."

59.    The press release touted "Jonathan Black's" purported experience: "Jonathan has a background in finance and start-up ventures.  He was a finance director/financial controller of two chains of bars in the UK (Regent Inns Plc – market value US$400m).  He has also set up a number of new ventures, including recently 'Car Share', a car sharing APP."

60.    Similarly, a January 2016 Bar Works Press Release identified "Jonathan Black" as the CEO of Bar Works, and provided his contact information for further information.

61.    During at least the Relevant Period, Bar Works also operated a website: www.barworks.nyc.

62.    Haddow's name appeared nowhere in any of the Bar Works press releases or on Bar Works' website during the Relevant Period.

63.    To sell Leases and Sub-Leases for particular Bar Works locations, Bar Works also typically provided potential investors—including through sales agents Defendants recruited—with one or more private placement memoranda specific to a particular Bar Works location (collectively, the "Bar Works Lease Memoranda").

11

64.     The Bar Works Lease Memoranda typically contained general content about the Bar Works Companies that varied little from memorandum to memorandum, in addition to information specific to the Bar Works location featured in each memorandum.

65.     At least one version of the Bar Works Lease Memoranda described Bar Works' Leases and Sub-Leases as follows: "Bar Works Wealthbuilder Program is the brand owned by Bar Works™ Inc. in which investors can purchase their own workspace on a 10 year lease and lease this back to Bar Works™ Management Inc. (its wholly owned subsidiary) for a fixed rental income."

66.     Haddow determined the content of the Bar Works Lease Memoranda and controlled their distribution.

67.     The Bar Works Lease Memoranda typically began with a "Letter from the Directors," purportedly signed by "Jonathan Black" as "Chief Executive, Bar Works Inc."

68.     Haddow's name appeared nowhere in the Bar Works Lease Memoranda.

69.     The representations and omissions described above in at least the September 2015 Press Release, the January 2016 Press Release, the Bar Works' website, the Bar Works Lease Memoranda, and the Lease and Sub-Lease agreements themselves were false or misleading.

70.     In reality, "Jonathan Black" was a fictitious name for a person who did not exist, and Haddow in fact founded, controlled, and owned the Bar Works Companies and their affiliates.

**2.     Haddow's Misappropriation and the Scheme's Unraveling.**

71.     Haddow later misappropriated at least some of the funds investors invested in the Bar Works Companies for his own use.  For example, of the investor funds the Bar Works

Companies raised by selling the Leases and Sub-Leases, Haddow transferred over $4 million to one or more accounts in Mauritius and $1 million to one or more accounts in Morocco.

72.     The Bar Works Companies and their affiliates stopped paying Lease investors monthly interest fees after approximately April 2017.

73.     In June 2017, Haddow left the United States as his scheme unraveled.

74.     Bar Works, 7th Avenue, and Bar Works Management are now defunct, and the Bar Works Leases and Sub-Leases sold to investors are effectively worthless.

**II.     Defendants Aided and Abetted the Fraud.**

   **A.     Defendants Knew Haddow Controlled Bar Works.**

75.     Aura, who knew Haddow as early as 2012 or 2013, reconnected with Haddow in New York, New York in approximately July 2015.

76.     Over the next few months, Aura and Haddow discussed Haddow's idea for investments in co-working spaces called Bar Works.  Aura advised Haddow about how to structure the Bar Works Leases based on Aura's past experience working as a sales agent for a company called Park First, which operated in the U.K. and offered investments in airport car parking spaces with a "guaranteed" rate of return.[1]

77.     In the fall of 2015, Aura agreed with Haddow that he would become an agent for Bar Works and sell Bar Works Leases.  In return, Haddow agreed to pay Aura a commission of 30% on the Bar Works investments he sold.

78.     In approximately November 2015, Aura began working out of the first open Bar Works location at the 39th Street Location and recruited sales sub-agents to sell Bar Works Leases using the Bar Works PPM and other marketing materials.

---

[1] In April 2017, the FCA found that Park First was promoting and operating unregistered collective investment schemes, which it was not legally authorized to do in the U.K.

79.     Haddow visited the 39th Street Location multiple times per week, where he discussed the Bar Works business with Aura.  According to a Bar Works employee, Aura called Haddow by the name "Ren."

80.     Aura and Haddow communicated regularly on the phone, via email, and by messenger services about Bar Works, and Aura understood that Haddow ran and controlled all important decisions about the business.

81.     Aura knew that Haddow created the Bar Works Lease Memoranda and determined the rates of returns that would be offered to investors who bought Leases and the structure of those offerings.

82.     For example, in a November 24, 2015 email exchange, Aura and Haddow discussed increasing the rate of annual fixed return the Bar Works Leases would offer investors to 12% for one unit, 15% for 2-4 units, and 15% for 5+ units to be competitive with other similar offerings of which they were aware.

83.     Aura also knew that Haddow decided how much commission each agent received on a sale and resolved disputes among agents regarding commissions.

84.     For example, on December 8, 2015, in an email chain between Aura and another Bar Works agent, Haddow told them how to handle a dispute over commissions for Leases sold to a new investor.

85.     Similarly, on or about May 6, 2016, a Bar Works agent emailed Haddow complaining that he – and not Aura – should have received commissions for a sub-agent's Lease sales.  He wrote "I really would appreciate it if you could ask Sam Aura to give a brief outline in writing of how and when he came into contact with the . . . agent."  Haddow forwarded the email

to Aura for an explanation.  On May 11, 2016, Aura replied to Haddow, explaining how he had signed up this sub-agent and ultimately "retained [the client] at 20%."

86.     Aura also knew that Haddow had access to and control of the Bar Works bank accounts and investor funds.

87.     For example, on December 15, 2015, Aura was copied on an email from a Bar Works employee to Haddow.  The employee asked Haddow to confirm that an investor had sent funds to Bar Works.  Haddow responded "[y]es received" and requested that the employee email "investor@[barworks.nyc] in future" emails going forward.

88.     Indeed, Aura knew that Haddow controlled how much money Bar Works paid Aura because Haddow personally approved payment on Core Agents' invoices.

89.     For example, on July 25, 2016, Aura sent Bar Works an invoice dated July 25, 2015 from Core Agents for $213,100 (the "July Invoice"), which reflected Aura's commission for selling $1,450,000 of Leases to investors.

90.     On August 20, 2016, Haddow emailed a banker in the Bahamas from the email account info@barworks.nyc, and asked her to pay the July Invoice, which he attached.  He signed the email "Renwick Haddow."  The banker replied and asked Haddow to confirm the beneficiary's name and address.  On August 22, 2016, Haddow, from the info@barworks.nyc account, forwarded the email containing his signature on the invoice to Aura, and asked him to "send me this quickly on email."  Aura replied with his full legal name, "Savraj Gata-Aura," and his address in New York, NY, noting that "(my name is already on the invoice at the bottom under beneficiary)."

91.     On August 24, 2016, Haddow, emailing from info@barworks.nyc, wrote to the same banker "I am out of the office today and cannot access my online banking.  Can you let me

know if the $213,100 was executed." He signed the email "Renwick Haddow." The banker replied to Haddow confirming the transfer, and Haddow subsequently forwarded the email to Aura.

92.      Finally, Aura and another Bar Works employee kept track of commissions Bar Works owed to sales agents who sold interests in Bar Works for Haddow.

**B.     Defendants Knew or Recklessly Disregarded "Jonathan Black" Was Fictitious and that Haddow used the "Jonathan Black" Alias to Conceal his Involvement in Bar Works.**

93.      During the Relevant Period, Aura knew or recklessly disregarded that Haddow used "Jonathan Black" as a fake name to conceal his involvement in Bar Works, due to the FCA's regulatory action against him.

94.      Indeed, Aura worked out of the 39th Street Location but never met or spoke to "Jonathan Black."

95.      Aura also knew that, in an attempt to conceal his identity, Haddow frequently forwarded Bar Works emails sent to renwick@renwickhaddow.com to the email account jonathan.black@barworks.nyc or info@barworks.nyc and Haddow replied from this address as "Jonathan Black" (hereinafter collectively referred to as the "Jonathan Black Email Address").

96.      For example, on May 13, 2016, Haddow and Aura received an email from a PR agent requesting that one of them take an interview regarding Bar Works and another product. Haddow forwarded the email to the Jonathan Black Email Address, and then Haddow replied, copying Aura and others, that "Jonathan Black" could do the call if it occurred in the late morning.

97.      In an email exchange on or about August 8, 2016, Haddow's attorney emailed Haddow at renwick@renwickhaddow.com a copy of the sub-lease agreement between Bar

Works Tribeca, Inc. and a sub-landlord for the property, which "Renwick Haddow" had personally signed on page 18 as the "Director" of "Bar Works Tribeca, Inc." Haddow forwarded the email and sub-lease agreement to the Jonathan Black Email Address, who then forwarded the email and attachment to Aura. Haddow, from the Jonathan Black Email Address, wrote to Aura "[m]ake sure you check my signatures for instance page 18 before sending this off." Haddow did not want his real name used, and was instructing Aura here to remove his real name.

98.     Indeed, at least as of August 2016, Aura knew that Haddow controlled the email account info@barworks.nyc. As described in paragraphs 90 and 91 above, Haddow signed the email to his banker from the info@barworks.nyc account "Renwick Haddow."

99.     Aura also knew that Haddow often declined to meet in person with investors, prospective investors, and reporters who were interested in learning about Bar Works.

100.     At Haddow's request, Aura covered for Haddow multiple times by meeting with investors, sales agents, and reporters on Haddow's behalf.

101.     For example, on March 25, 2016, a news reporter emailed a Bar Works employee and asked to set up a tour of a Bar Works location. The Bar Works employee forwarded the email to the Jonathan Black Email Address and asked if "Jonathan Black" was available to meet the reporter on the proposed date and time. Haddow replied from the Jonathan Black Email Address several days later, explaining that "Black" was away then, and asked if they could "find some alternative like Sam to be there if [the date] can't be changed." Haddow then looped Aura into the email conversation and asked him to cover the meeting with the reporter, instructing the employee not to reschedule. Aura met with the reporter at the 39th Street Location on or about March 30, 2016.

102.     Similarly, on August 10, 2016, Haddow, from the Jonathan Black Email Address, sent Aura a link to a U.K. newspaper article regarding an individual in the U.K. whom Haddow referred to as a "total scammer."  Using the Jonathan Black Email Address, Haddow further stated that Aura should "kick the [expletive] out of negative" persons who stated Haddow was involved with Bar Works.

103.     In order to help Haddow conceal his involvement in Bar Works, Aura usually forwarded questions about Bar Works' business from sub-agents or investors to the Jonathan Black Email Address instead of Haddow.  He did this so that he could forward the "Jonathan Black" response to the sub-agents or investors.

104.     On or about January 13, 2017, *The Real Deal*, an online website, published an exposé showing extensive connections between Bar Works and Renwick Haddow, "who allegedly ran a global multimillion-dollar Ponzi scheme and is being sued by U.K. authorities for misleading investors."  *The Real Deal*'s report also offered evidence that the LinkedIn page purportedly assigned to "Jonathan Black" used someone else's photo.

105.     Shortly thereafter, concerned investors and agents began calling Aura to ask if "Jonathan Black" was real and what Haddow's involvement was.

106.     Despite knowing that "Jonathan Black" did not exist, Aura directed his assistant to tell investors and agents that "Jonathan Black" was real, but that someone had created a LinkedIn page for Black and used a picture from Google, which had not been updated.

### C.     Aura Facilitated the Sales of Bar Works Leases to Investors Through False and Misleading Marketing Materials and Statements.

107.     Aura typically used the email address samuel@barworks.nyc to email Bar Works employees, agents, investors, and prospective investors.

108.     Defendants used sub-agents to sell Bar Works Leases.

109.     Aura recruited these sub-agents using the Bar Works Lease Memoranda and other marketing materials, which touted "Jonathan Black's" role as Bar Works' CEO and contained no mention of Haddow.  He provided these sub-agents, who directly contacted investors, with copies of the misleading Bar Works Lease Memoranda to provide to investors.

110.     Aura sent these documents to sub-agents he had recruited and sometimes directly to prospective investors through his Bar Works email or an online portal, to which he provided access.

111.     Defendants received a certain percentage of the funds they raised, usually 30% to 35% of each Lease they sold.  Aura paid or caused Haddow to pay sub-agents he recruited from his commission.

112.     Aura also served as an intermediary between Bar Works, on the one hand, and sub-agents and prospective investors, on the other hand, and interacted directly with investors if they asked to meet with someone from Bar Works.

113.     For example, in approximately January 2016, Aura and a sub-agent spoke with representatives of a global residential real estate brokerage firm based in India ("Agent One"). Aura explained to Agent One representatives that Bar Works took over old locations of bars that were vacant, renovated them, and then sold co-working memberships to individuals who wished to use the temporary workspace.  Bar Works offered investments in the form of a lease where Bar Works would sub-lease from investors.  The purpose of the call was to recruit these representatives to become agents of Bar Works and have them sell Bar Works leases to prospective investors overseas.

114.     On May 27, 2016, Haddow, through the Jonathan Black Email Account, forwarded Aura an exchange between a broker selling Bar Works investments in Malaysia and

an outside attorney working for Bar Works.  In the email exchange, a broker specifically asked the attorney "[w]hat are the legal implications should [Bar Works] fail or be a scam?" and "[w]hy are payments paid direct to Bar Works instead of through appointed lawyers?"  The attorney then forwarded the questions to Haddow at the Jonathan Black Email Account. Haddow in turn forwarded the email exchange to Aura, and wrote: "[c]heck this guy out. This guy is a bloody idiot: you don't ask a lawyer do you think the product will work out."

115.    In approximately July 2016, Agent One agreed to market Bar Works Leases in return for a 20% commission.  Aura did not mention Haddow's involvement in Bar Works. Instead, he made available to Agent One representatives Bar Works Lease Memoranda and other marketing materials, which touted "Jonathan Black's" role as Bar Works' CEO.  Agent One often directed questions from prospective investors in Bar Works to Aura.

116.    Based upon the information Aura provided, Agent One began selling Bar Works Leases using the marketing materials Aura provided.  For example, in July 2016, Agent One sold to three investors four Bar Works Leases for the Tribeca location, for $25,000 each.

117.    From approximately July 2016 through April 2017, using the inaccurate marketing materials Aura provided, Agent One sold at least $3 million worth of Bar Works Leases to investors.

118.    Aura also served as a main point of contact for several sub-agents who worked for a company that recruited Bar Works investors from China ("Agent Two").  From approximately September 2016 to March 2017, Aura provided Agent Two with copies of the misleading Bar Works Lease Memoranda for various Bar Works locations and made other material misstatements.

119.     For example, on November 16, 2016, Aura emailed a sub-agent for Agent Two ("Sub-Agent") offering Leases for the Bar Works space located at 116 Eighth Avenue, New York, New York: "Our seventh venue in the city, Bar Works at 16th and 8th Avenue, Manhattan, New York – now accepting applications!"  The email also stated that "[i]nvestments start at $25,000 for a 10-year lease on workspace units on a fixed rental which pays returns of 14-16% per annum.  Investors will receive their income monthly with their first payment made within 14 days from their investment.  You will need to act fast as we anticipate this site will sell out very quickly . . . . "  Aura attached to the email several documents, including a Bar Works Lease Memorandum for "Bar Works @ 16th & 8th," and a Bar Works FAQ.  The Lease Memorandum indicated that "Jonathan Black" was the Chairman of Bar Works and omitted any mention of Haddow.

120.     Agent Two subsequently sold Leases to investors in China for the Bar Works 8th Avenue location.  For example, on or about December 19, 2016, an investor from China entered into Lease and Sub-Lease agreements with Bar Works Eighth Avenue LLC, for five work spaces located at 116 Eight Avenue, and paid Bar Works $125,000.  The Lease and Sub-Lease agreements were countersigned by "Jonathan Black, Chief Executive Officer."

121.     Similarly, on December 16, 2016, Aura emailed Sub-Agent a Bar Works Lease Memoranda for Bar Works Miami and a Bar Works FAQ, writing "Bar Works Inc. continues its roll-out in the United States and is now accepting applications in our latest site in Miami!"  The Lease Memorandum indicated that "Jonathan Black" was the Chairman of Bar Works.

122.     Ultimately, Aura facilitated the sale of Bar Works securities to at least 27 investors from China via Agent Two, based in part on the false representations in the Bar Works Lease Memoranda.  In total, Bar Works raised at least $3 million from these investors.

**D.      As the Scheme Unraveled, Aura Continued to Lie to Investors and Agents About "Jonathan Black's" Existence and Haddow's Involvement in Bar Works.**

123.      In approximately January 2017, a representative from Agent One confronted Aura and another Bar Works Agent about the *Real Deal* report.

124.      Aura told the representative that "Jonathan Black" was the CEO of Bar Works and a major shareholder along with Aura and others.

125.      Aura further said that Haddow was just a consultant who did not own any equity in Bar Works.

126.      In March 2017, Sub-Agent and a Bar Works investor traveled from China to Manhattan to meet with Aura out of concern for whether there was any truth to the allegations she had read in the press regarding the involvement of Haddow in the Bar Works companies.

127.      On or about March 16, 2017, Aura met with the Sub-Agent and an investor in Manhattan, where Aura and another Bar Works representative made numerous materially false and misleading statements.  For example, Aura told Sub-Agent and the investor that Bar Works had one owner and one major shareholder, "Jonathan Black," who founded the company.  He also said Haddow never was involved with running Bar Works, except briefly in 2016 when Haddow helped "Jonathan Black" find locations for Bar Works workspaces.

**E.      Aura Made Additional Materially False Statements and Omissions to Investors, Prospective Investors, and Sales Agents in Bar Works.**

128.      On or about April 20, 2016, Aura was interviewed on a radio program called "School for Startups Radio."  In discussing Bar Works, Aura made several false and misleading statements.  For example, Aura falsely stated on the radio program that Bar Works was "very, very profitable as an entity" and that each location that Bar Works opened was "profitable very,

very quickly."  Aura knew that the 39th Street Location, Bar Works' first location, was not

profitable, based in part on the lack of customers at this location while he worked there.

129.     Aura knew in early 2017 that Bar Works was having trouble paying its

investors, having received numerous complaints from investors who had not been paid on time.

130.     In fact, Aura discussed with Haddow that new investor money would need to

be used to make rental payments to older investors, and that Aura should tell investors and sub-

agents that the payments were late because of problems with banks, which Aura did.

131.     As a result, Aura continued to solicit new investors.  For example, on February

16, 2017, Aura emailed Sub-Agent with the subject line "A few updates from Bar Works!" and

wrote that Bar Works had "over 70 spaces left in Miami available for investment . . . we expect

this site to sell out fast."  Aura also wrote that he had attached a "Bar Works Executive

Summary" (the "Executive Summary") to the email, "which will highlight some of what Bar

Works has achieved since it opened its doors in November 2015."  The Executive Summary

contained numerous false statements, including grossly inflated projected revenue and

profitability figures, which Aura knew to be false given his knowledge of Bar Works' inability to

pay rental income to its investors.

132.     In March 2017, Aura also falsely told Sub-Agent and an investor that open Bar

Works locations were generating between $100,000 to $140,000 per month, and that Aura

expected a 25% profit margin across the board after paying the investors.

### F. Defendants Received Compensation for Their Role in the Fraudulent Bar Works Scheme

133. Aura's efforts on behalf of Bar Works led to the sale of over $10 million of Bar Works Leases from over one hundred investors globally.

134. From November 2015 through April 2017, Defendants received approximately $2.9 million in commissions from Bar Works—through bank accounts in the name of Core Agents, Aura, and other entities he owned and controlled—for the sales of Leases to Bar Works investors.

### FIRST CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)
### (Against Both Defendants)

135. The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 134.

136. As alleged above, Haddow, Bar Works, and 7th Avenue violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

137. Defendants knowingly or recklessly provided substantial assistance to Haddow, Bar Works, and/or 7th Avenue with respect to the violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] by each of them.

138. By reason of the foregoing, Defendants are liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting the violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] by Haddow, Bar Works, and/or 7th Avenue.

### SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5
### (Against Both Defendants)

139. The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 134.

140.     As alleged above, Haddow, Bar Works, and 7th Avenue violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

141.     Defendants knowingly or recklessly provided substantial assistance to Haddow, Bar Works, and/or 7th Avenue with respect to the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by each of them.

142.     By reason of the foregoing, Defendants are liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting the violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by Haddow, Bar Works, and/or 7th Avenue.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

## I.

Permanently enjoining Defendants and each of their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## II.

Ordering Defendants, jointly and severally as appropriate, to disgorge with prejudgment interest all ill-gotten gains from the conduct alleged in this Complaint;

### III.

Ordering Defendants to pay civil money penalties under Securities Act Section 20(d) [15

U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

### IV.

Granting any other and further relief this Court may deem just and proper.

Dated:  New York, New York
        May 23, 2019


                        _____
                        MARC P. BERGER
                        REGIONAL DIRECTOR
                        Lara Shalov Mehraban
                        Sandeep Satwalekar
                        Christopher J. Dunnigan
                        Alison R. Levine
                        SECURITIES AND EXCHANGE
                        COMMISSION
                        New York Regional Office
                        200 Vesey Street, Suite 400
                        New York, New York 10281
                        (212) 336-0061 (Dunnigan)
                        dunnigancj@sec.gov